# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Deanna Goodman,                                   Civil No. 07-cv-1596 (DWF/AJB)

        Plaintiff,

v.                                                **Report and Recommendation on the**
                                                  **Parties' Cross Motions**
                                                  **for Summary Judgment**

Michael J. Astrue, Commissioner of
Social Security,

        Defendant.

_____

Edward C. Olson, Esq., for Plaintiff Deanna Goodman.

Frank J. McGill, Jr., Acting United States Attorney and Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social Security.

_____

## Introduction

      Deanna Goodman ("Plaintiff") disputes the unfavorable decision of the Commissioner of the Social Security Agency ("Commissioner") denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423(d), 1382©.   This matter is before the Court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross motions for summary judgment.   See 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.   This Court has jurisdiction under the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). Based on the reasoning set forth below, this Court **recommends** that Plaintiff's Motion for Summary Judgment [Docket No. 10] be **denied** and that the Commissioner's Motion for Summary Judgment [Docket No. 17] be **granted**.

**Procedural History**

Plaintiff filed an application for DIB and SSI on December 23, 2003 (Tr. 15).[1]  In both applications, Plaintiff alleged disability beginning February 15, 2002 (Tr. 15).  The claims were initially denied on March 22, 2004, and upon reconsideration on June 10, 2004 (Tr. 30, 36).  Plaintiff then filed a written request for hearing on July 12, 2004 (Tr. 15).  A hearing was held on November 22, 2005, before Administrative Law Judge Roger W. Thomas ("ALJ")(Tr. 45-47, 292-343).  On March 10, 2006, the ALJ found that Plaintiff was not disabled because she retained the ability to perform a significant number of jobs in the national economy (Tr. 15-24).  On January 26, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner (Tr. 5-7).  See 20 C.F.R. §§ 404.981, 416.1481.  On March 21, 2007, Plaintiff sought review from this Court.  The parties thereafter filed cross motions for summary judgment.

**Factual Background and Medical History**

*Factual Background*

Plaintiff was born on May 13, 1975, and at the time of the ALJ's decision, was 30 years old.  Plaintiff completed high school, but did take some special education classes (Tr. 81, 177, 308).  At the hearing, Plaintiff testified that she could read and write (Tr. 300), but had problems counting money (Tr. 309).  After graduation, Plaintiff completed a nurse's aid program (Tr. 177).  Plaintiff was formerly employed as a nursing assistant, janitor, wheelchair assistant, teacher's aid, and cashier (Tr. 76, 179).  Plaintiff was single with two children under the age of 18 at the

---

[1] Plaintiff's SSI application, as well as the initial and reconsideration determinations on that application, were not available for inclusion in the record (Tr. 4).

time of the hearing in front of the ALJ, but both children were cared for by Plaintiff's mother and mother-in-law (Tr. 297).[2]  Although Plaintiff indicated that she saw her children every other day (Tr. 298).

She admitted to smoking half-a-pack of cigarettes daily for the last four years (Tr. 300). Plaintiff also drank alcohol on a regular basis (Tr. 300). Plaintiff told the ALJ that she had not used street drugs, cocaine, or marijuana in the last five years (Tr. 301).  Later in the hearing, however, Plaintiff testified that she had used marijuana in the recent past and on a weekly basis (Tr. 308).

In addition, Plaintiff indicated that she was on medication to help with her reported depression, but she also confessed that she only took her medication once or twice a week even though her prescription called for daily consumption (Tr. 302).  Plaintiff did admit that she did not take her medication in part because she did not feel the need to take them (Tr. 305).  She also admitted that at time she forgot to take them (Tr. 302).  Her feelings of depression were somewhat dependent on whether she took her medication (Tr. 304).  She has never been hospitalized for depression (Tr. 303).  Plaintiff also indicated that her relationship with her former husband negatively affected her depression (Tr. 309).  At the time of the hearing, Plaintiff's depression was worse than in 1997 when she last sought mental health treatment (Tr. 317).

Plaintiff also stated that she had difficulty walking long distances, and that she suffered from shortness of breath after no more than walking a block (Tr. 301).  She did her own cooking,

---

[2]  Child Protection took Plaintiff's children and placed them with their respective grandmothers upon discovery of the daily chemical use of Plaintiff and her husband (Tr. 179).

cleaning, and grocery shopping (Tr. 303).

*Medical History*

As previously stated, Plaintiff alleged disability as of February 15, 2002 (Tr. 15).  In June 2002, Plaintiff discovered that she was pregnant (Tr. 170).  A few months later, Plaintiff was diagnosed with intrauterine growth restriction (Tr. 166).[3]  Throughout the pregnancy, Plaintiff dealt with diet issues (Tr. 169).  Medical notes in November 2002 indicated that Plaintiff was seeing someone with the "Life Track" program to help her with housing and employment (Tr. 167).

In December 2002, medical notes reported that Plaintiff had no food in her home and was going to the food shelf (Tr. 166).  Plaintiff's doctor noted that Plaintiff was "unable to work or attend school due to IUGR (Tr. 165).  The importance of intaking food, calories, and protein was also revisited with Plaintiff (Tr. 162).

One month later, Plaintiff continued to have issues with poor diet (Tr. 161).  Plaintiff told her nurse midwife that she sometimes ran out of food before the 8th of the month (Tr. 161).  She then had to wait until 13th of the month to receive her food stamps (Tr. 161).

"Outpatient Progress Notes" from February 2, 2003, indicated that Plaintiff saw Mary Temple in the mental health unit for issues with depression, decreased appetite, and crying for days (Tr. 157, 208).  She stated that at times she had suicidal thoughts (Tr. 208).  Plaintiff said that she was depressed since 2001 when her father died and she had a miscarriage (Tr. 209).

---

[3]  Intrauternine growth restriction ("IUGR") is a term used to describe a condition in which the fetus is smaller than expected for the number of weeks of pregnancy. <u>See</u> http://www.healthsystem.virginia.edu/uvahealth/peds_hrpregnant/iugr.cfm (last visited July 10, 2008).

Plaintiff was diagnosed with major depressive disorder, low IQ, complicated bereavement, and situational stressors and conflict with her family (Tr. 211).  An eating disorder was ruled out, and Plaintiff was assigned a GAF score of 31 (Tr. 211).[4]  During the same month, Elizabeth Donnelly, a social worker at Community University Health Care Center ("CUHCC"), diagnosed Plaintiff with depression NOS (Tr. 212-13).[5]  Plaintiff was thereafter placed on Celexa[6] by Dr. Bacaner  (Tr. 157).

Plaintiff saw Dr. Kroll, a psychiatrist, at CUHCC (Tr. 201-05) on March 13, 2003.  Plaintiff attributed the onset of her depression to the unexpected death of her stepfather in January 2001 (Tr. 201).  Plaintiff was also stressed because she was dealing with issues concerning her abusive husband, her daughter's recent birth, her lack of employment, and the possibility that she would be evicted for failure to pay rent (Tr. 201).  She stated that Dr. Bacaner prescribed medication (i.e. Celexa), which started to make her feel better (Tr. 201).  Plaintiff indicated that her energy, interest, and sleep were "ok", but motivation and concentration were

---

[4] GAF represents "the clinician's judgment of the individual's overall level of functioning."  A scale of 0 to 100 is used, on which 10 represents "persistent danger of severely hurting self or others", and 100 represents "superior functioning in a wide range of activities." Diagnostic & Statistical Manual of Mental Disorders, p. 32 (4th ed. 2000)(hereinafter "DSM").  On this scale, 31 to 40 represents "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant" to "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)". Id.

[5] "If a patient exhibits the depressive symptoms as the major feature of their disorder, but does not meet the [DSM] criteria used for any other mood disorder or any other mental disorder, then the depressive disorder, NOS is used." http://www.depression-guide.com/depressive-disorder-nos.htm (last visited July 10, 2008).

[6] "Celexa is used to treat major depression-a stubbornly low mood that persists nearly every day for at least 2 weeks and interferes with everyday living." The PDR Family Guide to Prescription Drugs, pp. 126-27 (8th ed. 2000)(hereinafter "PFG").

poor (Tr. 201-02).  She also said that she intentionally "restrict[ed her] intake [of food] to maintain low weight" because she liked being thin (Tr. 201).  Plaintiff described her mood as "better", but that her mood worsened if she thought of the stresses in her life (Tr. 202).  She was "fully independent" in all activities of daily living (Tr. 204).

Upon mental status exam, Plaintiff had intact thought processes, fair insight, and no hallucinations, delusions, suicidal or homicidal ideation (Tr. 204).   She also had impaired judgment secondary to low IQ and depression (Tr. 204).  She was neatly groomed, cooperative, open to disclosing information, calm, and oriented to person, place, time, and situation (Tr. 204). Plaintiff's mood was euthymic (i.e., normal, non-depressed) (Tr. 204).  Dr. Kroll noted that she was motivated to get help (Tr. 204).  Ultimately, Dr. Kroll diagnosed Plaintiff with depression NOS, but ruled out anorexia nervosa and mild mental retardation (Tr. 205).  He assigned her a GAF score of 33 and recommended therapy and continued medication (Tr. 205).

In April 2003, Plaintiff reported improved mood at her mental health therapy session at CUHCC (Tr. 197, 199).  On a scale of one to ten (ten being the best), Plaintiff stated that her mood was a "ten" (Tr. 197).  Her mood was a "1" before she started taking medication (Tr. 197). Evaluation notes indicated that Plaintiff's had full range affect; her thought process was logical and goal-oriented; she was well-groomed; her insight and judgment was fair to impaired; her speech was logical, but slow and soft; and her behavior was calm and cooperative (Tr. 197, 199). Plaintiff was diagnosed with major depression, recurrent moderate (Tr. 197, 199).  She described her mood as stable (Tr. 196).  Plaintiff continued to deal with situational stress, but it was less extreme than prior visits (Tr. 196).

On May 6, 2003, Plaintiff's husband reported that she was smoking a "significant amount

of pot" (Tr. 155).  Plaintiff noted as "healthy" and "stable depression" by Barbara Gershan,

RNC, on August 12, 2003 (Tr. 154).

     In November 2003, Plaintiff was referred to Dr. Michael J. Kearney for psychological

evaluation (Tr. 176).  Dr. Kearney spent six to eight hours evaluating, interviewing, and testing

Plaintiff (Tr. 182).  Dr. Kearney administered a Porteus Maze[7] and started the Wechsler Adult

Intelligence Test[8] (Tr. 176).  Dr. Kearney noted that Plaintiff's clothing and physical hygiene

were appropriate (Tr. 177).  Plaintiff was cooperative during the evaluation (Tr. 177).  Her

speech showed good content and flow (Tr. 177).  Dr. Kearney stated that Plaintiff's "intellectual

functioning [was] not impaired by psychological reasons" (Tr. 177).  Plaintiff denied

hallucinations or illusions, and did not report any schizophrenic or psychotic symptoms (Tr. 177-

78).  However, Dr. Kearney did indicate that Plaintiff may have some depressive symptomology

and possibly some long term dysthymia[9] symptoms (Tr. 178).

     Plaintiff also completed the Wechsler Adult Intelligence Scale ("WAIS") and Wechsler

Abbreviated Achievement Test ("WAAT") given to her by Dr. Kearney (Tr. 175).  The WAIS

---

[7] The Porteus Maze test is a non-verbal test of intelligence that consists of a set of paper forms on which the subject is required to trace a path through a drawn maze of varying complexity.  There is no time limit for this test.  The subject must avoid blind alleys and dead ends; no back-tracking is allowed.  See http://en.wikipedia.org/wiki/Porteus_Maze_Test (last visited July 10, 2008).

[8] The Wechsler Adult Intelligence test is a general test of intelligence. See http://en.wikipedia.org/wiki/Wechsler_Adult_Intelligence_Scale (last visited July 10, 2008).

[9] Dysthymia is a chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by symptoms such as: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. See Stedman's Medical Dictionary, p. 602 (28th ed. 2006)(hereinafter "SMD").

revealed that Plaintiff had a verbal IQ of 75, a performance IQ of 87, and a full scale IQ of 79,

placing Plaintiff in the low average to borderline range of intellectual functioning (Tr. 181).  The

WAAT revealed that Plaintiff had a sixth grade reading level, a fifth grade math level, and a

twelfth grade spelling level (Tr. 181).  Dr. Kearney stated that Plaintiff's performance scales, on

one hand, indicate that her concentration, attention, anxiety, and sequencing ability were poor

(Tr. 181).  On the other hand, her high scores in areas such as visual-spatial problem solving,

non-verbal reasoning, and verbal-motor skills indicated that Plaintiff may have a learning

disability (Tr. 181).  In other words, "Plaintiff may understand a situation but may be unable to

verbally describe [it]" (Tr. 181).  Dr. Kearney diagnosed cannabis dependence (in remission for

the past two months), learning disorder, dysthymic disorder (early onset)[10], attention deficit

disorder (predominantly inattentive type), and ruled out fetal alcohol syndrome (Tr. 182).  He

assigned Plaintiff a GAF score of 70, which is defined as only "mild" symptoms (Tr. 182).[11]  He

also recommended that Plaintiff seek family/marital counseling and assertiveness training (Tr.

184).

Plaintiff returned to CUHCC and saw Terri Saracino, a social worker, on March 22, 2004

(Tr. 189).  Plaintiff indicated that she wanted to resume taking anti-depressant medication, but

was "ambivalent" about resuming one-on-one counseling (Tr. 189).  Upon examination,

Plaintiff's mood was euthymic (Tr. 189).  Ms. Saracino noted that Plaintiff's affect was

appropriate with full range; her thought process was logical and goal-oriented; she was well-

---

[10] Dysthmic disorder is a chronic disturbance of mood characterized by mild depression.
See http://www.psychologyinfo.com/depression/dysthymic.htm(last visited July 10, 2008).

[11] A GAF score of 70 indicates the individual is "generally functioning pretty well" and
has only "mild symptoms." DSM, at p. 34.

groomed; her insight and judgment was fair; her speech was logical, but slow and soft; and her behavior was calm and cooperative (Tr. 189).  Plaintiff was diagnosed with major depression with mild intensity (Tr. 189, 249-56).

At that time, Dr. Gregory Korgeski, the state agency psychological consultant, reviewed the record and opined that Plaintiff had markedly limited abilities in understanding and remembering detailed instructions and carrying out detailed instructions (Tr. 228).  Although her ability to understand, remember, and carry out simple instructions was not significantly limited (Tr. 228).  Plaintiff was moderately limited in her ability to make simple work-related decisions; interact appropriately with the general public; to respond appropriately to changes in the work setting; to set realistic goals or make plans independently of others; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 228-29).  Despite these limitations, Dr. Korgeski opined that Plaintiff's impairments did not meet/equal any of the disorder listings (Tr. 232).  He limited Plaintiff's residual functioning capacity ("RFC")[12] to: routine 1-2 step instructions with adequate persistence, pace, quality for at least entry-level competitive work; routine, superficial interactions with co-workers and the public; routine supervision; and adapt only to routine changes in the workplace (Tr. 232).  Dr. Dan Larson subsequently reviewed the record and agreed with Dr. Korgeski's determination (Tr. 233).

---

[12] An RFC rates the residual (i.e. leftover) functioning capacity of a claimant after taking into account the claimant's mental or physical disability. See http://www.disabilitysecrets.com/rfc-medical-source-statement.html (last visited July 10, 2008)(no emphasis added).

In April 2004, Ms. Saracino noted that Plaintiff's mood was mildly depressed, but there was no suicide risk (Tr. 186). She was diagnosed with depression NOS (Tr. 186). Her affect was appropriate with full range; her thought process was logical and goal-oriented; she was well-groomed; her insight and judgment was fair; her speech was logical, but slow and soft; and her behavior was calm and cooperative (Tr. 186). Plaintiff told Ms. Saracino that she wanted to undergo adaptive testing, resume counseling, and start taking Celexa again (Tr. 186). Plaintiff also stated that she wanted to get divorced; she had not seen or talked to her husband "for months" (Tr. 186). She cried when she talked about her husband's abusive behavior, but had not followed through on domestic violence group treatment (Tr. 186-87).

On May 20, 2004, Plaintiff saw Elizabeth Rogers, M.D., a psychiatrist at CUHCC "after a year-long absence" (Tr. 244). Plaintiff reported that she had been in treatment for chemical dependency since her last visit (Tr. 244). During that time Plaintiff also left her husband (Tr. 244). Plaintiff described her mood as depressed and suicidal, but she also said that had not taken her depression medication since March (Tr. 244). Dr. Rogers diagnosed depression, noted that Plaintiff was "off Celexa x 6 weeks and sober", and prescribed another prescription of Celexa (Tr. 244). A week after her visit with Dr. Rogers, Plaintiff took a urine drug screen which came back "high positive" for marijuana (Tr. 242). Later that month, Ms. Saracino saw Plaintiff and recommended that Plaintiff begin chemical dependency treatment and continued medical management with Celexa (Tr. 240-41). If Plaintiff remained sober, Ms. Saracino indicated that she would not recommend counseling (Tr. 241). She also noted that Plaintiff's motivation for one-to-one counseling was unclear (Tr. 241).

In June 2004, Dr. Rogers reported that Plaintiff was in chemical dependency treatment

and had abstained from marijuana abuse for three weeks (Tr. 236). A urine toxicology screening

tested "weakly positive" for marijuana (Tr. 236). Plaintiff indicated that Celexa had been very

helpful and that she was no longer depressed (Tr. 236). Plaintiff appeared more physically

active and cheerful (Tr. 236). Dr. Rogers final diagnosis was depression NOS (Tr. 236). He also

refilled her Celexa prescription (Tr. 236).

     In September 2004, Dr. Rogers reported that Plaintiff was "doing well overall" (Tr. 235).

Plaintiff said her mood was "pretty good", and she denied anxiety, panic, or depressed mood (Tr.

235). Also, weekly urine tests confirmed that Plaintiff was now sober (Tr. 235). Dr. Rogers'

diagnosis remained depression NOS (Tr. 235).

     In March 2005, Plaintiff began psychotherapy with Linda Hermanson, a clinical nurse

specialist (Tr. 272). Plaintiff stated that she had been depressed most of her life (Tr. 272). She

told Ms. Hermanson that her depression often made her cry, she had decreased motivation, and

difficulty concentrating (Tr. 272). She indicated that she was treated with Celexa for her

depression, but she had not taken it for over a year because it made her tired (Tr. 272). Plaintiff

also stated that her cousin was recently shot and killed, which compounded her depression (Tr.

272). Ms. Hermanson reported that Plaintiff's insight and judgment were "intact and good" (Tr.

272). Plaintiff's affect was appropriate considering her current circumstances (Tr. 272). Her

mood seemed depressed, but she gave no indication of hallucinations, delusions, paranoia, or

suicidal ideation (Tr. 272). Ms. Hermanson's evaluation noted that Plaintiff had never been

hospitalized for mental health issues, but she did receive outpatient treatment at the CUHCC (Tr.

273). Ms. Hermanson noted that Plaintiff's was very motivated to seek help and to make

changes in her life (Tr. 272). Plaintiff was diagnosed with major depression (recurrent

moderate), and cannabis abuse in remission (Tr. 273).  Ms. Hermanson assigned Plaintiff a GAF score of 60 (Tr. 273).[13]

In May and early June of 2005, Plaintiff expressed interest in trying another anti-depressant because Cymbalta[14] was causing nausea (Tr. 269-70).  Plaintiff was then prescribed Lexapro (Tr. 269).[15]  However, Plaintiff reported that she felt better taking Lexapro at her next couple visits with Ms. Hermanson (Tr. 267-68).  It helped her sleep at night and gave her more energy (Tr. 268).  She also reported that she was no longer crying during the day (Tr. 268).  Plaintiff also indicated that her new medication caused her to have a bigger appetite (Tr. 268).  In light of that issue, Ms. Hermanson discussed some weight management options with Plaintiff (Tr. 268).  Overall, Plaintiff's mental condition had "improved" (Tr. 267).  However, Plaintiff was still concerned that she had no source of income (Tr. 267-68, 270).  Ms. Hermanson wrote Plaintiff a letter stating that she was unable to look for work because "she [was] still suffering from depression", which seemed to help Plaintiff relax (Tr. 267).

Plaintiff told Ms. Hermanson that she had low motivation and low energy, had cried a few times since her last visit, and wanted to take medication (Tr. 271).  During the therapy session, Plaintiff was "pleasant and cooperative", but her affect was somewhat restricted (Tr. 271).  She had no suicidal ideation (Tr. 271).  Ms. Hermanson started Plaintiff on Cymbalta because Plaintiff indicated that her previous medication did not help her depression (Tr. 271).

---

[13] A GAF score of 60 signifies "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)". DSM, at p. 34.

[14] Cymbalta is indicated for the treatment of major depressive disorder. Physicians' Desk Reference, p. 1758 (61st ed. 2007)(hereinafter "PDR").

[15] Lexapro is indicated for the treatment of major depressive disorder. PDR, at p. 1190.

Plaintiff met with Ms. Hermanson again on June 28, 2005.  Plaintiff told Ms. Hermanson that she went to court for her child support payments (Tr. 266).  She reported that her mood was "quite good" and "mostly energized" (Tr. 266).  Her medication helped her sleep at night (Tr. 266).  Plaintiff indicated that she was looking forward to some upcoming trips with her family members, which she helped organize (Tr. 266).  She reported no difficulties with her appetite (Tr. 266).  Ms. Hermanson noted that Plaintiff's "depression ha[d] improved quite a bit" since they started meeting (Tr. 266).

Between her next visit with Ms. Hermanson, Plaintiff was very active (Tr. 263).  She went to Mississippi to visit family and she also went to Wisconsin Dells with her daughter (Tr. 263).  Plaintiff continued to have difficulty sleeping (Tr. 263).  Ms. Hermanson reported that Plaintiff had an "upbeat" mood and good relationships with her family members (Tr. 263).  Plaintiff enjoyed taking care of her son and told funny stories about him (Tr. 263).  Ms. Hermanson also discussed diet and exercise ideas for Plaintiff, and encouraged "better sleep hygiene" (Tr. 263).

On the same day, Plaintiff also met with Dr. Ngozi Wamuo, a psychiatrist at CUHCC (Tr. 264).  Plaintiff indicated that Lexapro helped her mood and increased her appetite (Tr. 264).  On examination, Plaintiff had normal psychometer activity; congruent affect and mood; regular speech; adequate fund of knowledge; and no evidence of mania or psychosis (Tr. 264).  Dr. Wamuo recommended that Plaintiff continue to use Lexapro, and he also encouraged her to exercise and be more active (Tr. 264).  Plaintiff was also to continue her individual therapy with Ms. Hermanson (Tr. 264).  Dr. Wamuo diagnosed Plaintiff with cannabis abuse and major depression with moderate intensity (Tr. 264).

On September 12, 2005, Plaintiff saw Ms. Hermanson to discuss her concerns over gaining weight (Tr. 262). She admitted that she had been eating a lot, but had not been using alcohol (Tr. 262). Ms. Hermanson discussed several diet and exercise options with Plaintiff (Tr. 262). Ms. Hermanson also noted that Plaintiff continued to have problems with energy and sleeping due to her depression (Tr. 262).

Plaintiff visited Dr. Wamuo for a psychiatric evaluation on September 27, 2005 (Tr. 259-61). Plaintiff reported that staying with her husband made her feel depressed (Tr. 259). The last month or so Plaintiff was staying with her mom and feeling much better (Tr. 259). Plaintiff stated that she had been depressed her whole life (Tr. 259). She indicated that she felt suicidal and in the past had thought about overdosing although she had never attempted suicide (Tr. 259). Plaintiff denied any psychotic or manic symptoms (Tr. 259). Plaintiff also reported being depressed because she had no job (Tr. 259). Occasionally she had difficulty sleeping (Tr. 259). Plaintiff noted problems with fluctuating energy levels, as well as poor concentration and diet (Tr. 259). She also told Dr. Wamuo that she had been sober for approximately a year, although the record also noted that she drank alcohol "occasionally" (Tr. 259).

Upon mental examination, Dr. Wamuo opined that Plaintiff was alert, oriented, and well-groomed (Tr. 260). She did not appear to be in distress and did not show any speech impairments (Tr. 260). Plaintiff was pleasant and cooperative with good eye contact and normal psychometer activity (Tr. 260). Plaintiff did not exhibit any suicidal or homicidal ideation (Tr. 260). She was organized with her thoughts and very cognizant (Tr. 260). In the end, Dr. Wamuo diagnosed Plaintiff with dysthymia, major depressive disorder NOS, adjustment disorder with depressive features, and fetal alcohol spectrum disorder (Tr. 260). He assigned her a GAF

14

score of 55 to 60 (Tr. 260).  Dr. Wamuo also recommended that Plaintiff continue using

Cymbalta (Tr. 260).  If Plaintiff decided to stop taking her medication, Dr. Wamuo advocated for

psychotherapy and medication only when her condition worsened (Tr. 260).

      Plaintiff visited with Ms. Hermanson twice in October 2005 (Tr. 257-58).  Plaintiff

indicated that she had been having flashbacks at night of the abuse she suffered from her

estranged husband (Tr. 258).  She also reported continued difficulty with over-eating (Tr. 258).

Ms. Hermanson stated that Plaintiff's mood seemed to improve throughout the session (Tr. 258).

Plaintiff also reported that she had been doing "fairly well" (Tr. 257).  Since their last visit,

Plaintiff had not thought about her former husband (Tr. 257).

      On the day of the administrative hearing, November 22, 2005, Plaintiff saw Ms.

Hermanson and Dr. Wamuo (Tr. 288-89).  Plaintiff told Ms. Hermanson that she continued to

feel depressed (Tr. 289).  However, Dr. Wamuo reported that Plaintiff was "doing well", but that

she continued to "experience feelings of increased depression and crying" due to her family

situation (Tr. 288).  Plaintiff felt "fifty percent improvement" with taking Lexapro (Tr. 288).  Dr.

Wamuo stated, "Overall, no major concerns reported today" (Tr. 288).  Upon mental status

examination, Plaintiff was "alert, oriented, well-groomed, appropriately dressed, pleasant and

cooperative, with good eye contact" (Tr. 288).  Her mood was "good" and her affect was

"appropriate and animated" (Tr. 288).  Plaintiff had no delusions, hallucinations, paranoia,

suicidal ideas, or homicidal thoughts (Tr. 288).  Dr. Wamuo diagnosed Plaintiff with cannabis

abuse and moderate, recurrent major depression (Tr. 288).  He also increased Plaintiff's dosage

of Lexapro (Tr. 288).

      That same day, Dr. Wamuo and Ms. Hermanson completed a form regarding Plaintiff's

"Ability to Do Work-Related Activities (Mental)"(Tr. 285).  They rated Plaintiff's  abilities to maintain regular attendance, make simple work-related decisions, perform at a consistent pace, deal with normal work stress, set realistic goals, and complete a normal workday and workweek without interruption from psychologically based symptoms as "poor or none" (Tr. 285-86).  Except for the ability to maintain appearance (which they rated as "good"), Plaintiff's abilities were rated as "fair" in all other categories (Tr. 285-86).  Dr. Wamuo and Ms. Hermanson opined that Plaintiff would miss more than three days of work per month (Tr. 287).

On January 20, 2006, Dr. Wamuo and Ms. Hermanson jointly wrote a letter to the ALJ stating that Plaintiff "would not fair so well in a competitive employment situation where she would be expected to meet certain production standards and would not have the supportive, one-on-one relationship with supervisors and co-workers that she has...in a treatment environment" (Tr. 290).  Through her therapy, Plaintiff was learning ways to deal with stressful situations (Tr. 290).  The ALJ believed the best solution to Plaintiff's depression was for Plaintiff to avoid or withdraw from stressful situations (Tr. 290).  However, both Dr. Wamuo and Ms. Hermanson did not think that a competitive employer would allow Plaintiff to leave the workplace several times a day to deal with her stress, especially if Plaintiff had to maintain attendance and production standards (Tr. 290).  While Plaintiff's condition may eventually improve, they opined that Plaintiff was not capable of sustaining gainful employment at that time (Tr. 291).


**Testimony at Administrative Hearing**

*Plaintiff's Relevant Testimony*[16]

---

[16] See supra "Factual Background".

*Testifying Expert's Relevant Testimony*

From Dr. Karen H. Butler's review of the record, Plaintiff had been diagnosed in the past with major depression recurrent, borderline intellectual functioning and a learning disability, cannabis abuse, and some considered a diagnosis of attention deficit disorder ("ADHD")[17] (Tr. 319-20).  Dr. Butler opined that Plaintiff was moderately impaired in daily living and social functioning (Tr. 322).  Concentration, pace, and persistence was also moderately impaired (Tr. 323).  Dr. Butler testified that she would limit Plaintiff to work that would be routine, repetitive, and would not require a significant amount of reading (Tr. 325).  Standards for pace and production would be low to moderate (Tr. 325).  Dr. Butler also advised against a work environment where drugs and alcohol may be served (Tr. 325).

After the ALJ's examination, Dr. Butler was then questioned by Plaintiff's counsel (Tr. 325).  Dr. Butler admitted that she did not actually examine Plaintiff before testifying; her evaluation was based on her review of the notes and findings of Plaintiff's treating physicians (Tr. 325-26).  She also indicated that Dr. Wamuo's and Ms. Hermanson's own opinions were contradictory in that their clinical notes reported mild to moderate impairment, yet their report for the SSA (Tr. 285-89) noted severe impairment (Tr. 326).  Dr. Butler could not explain the reason for the discrepancy in the treatment notes and the subsequent opinions regarding Plaintiff's ability to engage in work-like activities (Tr. 327-28).

*Vocational Expert's Relevant Testimony*

Barbara E. Wilson-Jones, a vocational expert, testified as to Plaintiff's ability to work

---

[17] Before Plaintiff was actually diagnosed with ADHD, Dr. Wamuo and Linda Hermanson wanted to do a urine screen to make sure she was not using drugs or alcohol (Tr. 319-20).

(Tr. 328-342).  The ALJ constructed a hypothetical question for Ms. Wilson-Jones (Tr. 329):

> [W]e're discussing a female person..the age range of 26 to 30 years, with apparently a twelfth grade education, though having some Special Education, with the impairments [Dr. Butler] has noted...she would have to be restricted to work with routine, repetitive tasks and she said not a lot of reading as a part of the job task...one way to interpret that is to allow instructions to be simple, if they're in writing, she indicated low to moderate standards of patient production and brief superficial contacts with others [including the public and co-workers] of course in a setting where drugs or alcohol are not sold or served.  With those kinds of limitations...could a person with those do any of the past jobs set out in your report?[18]

Ms. Wilson-Jones' response was, "Yes, Your Honor.  She could" (Tr. 329).  Out of all of the past relevant jobs listed, Ms. Wilson-Jones opined that Plaintiff could do her janitorial job (depending on whether Plaintiff's "exertional limitations" were "light or medium")(Tr. 330).  The ALJ then posed a second hypothetical to Ms. Wilson-Jones based on her previous response (Tr. 331):

> If I were to add to those restrictions...that she couldn't work at greater than a light exertional level, that is being on her feet more than six hours out of the day, lifting up to 20 pounds then only occasionally and, of course, lifting frequently up to 10 pounds, would that change your testimony as to past work?

Her response again was, "No.  Because in the janitorial category, there's at least seven to 10,000 [jobs]...that are in the light category with the type where you go into a building after everybody else is gone and you clean up the offices" (Tr. 331).  The ALJ then asked whether Ms. Wilson-Jones' opinion would change if she were given the restrictions in Dr. Wamuo's "Medical Opinion Re: Ability To Do Work-Related Activities (Mental)" (Tr. 285-88, 331).  Ms. Wilson-Jones stated that her opinion under those restrictions would have changed and that there would

---

[18] In the "Vocational Analysis" submitted to the ALJ on November 22, 2005, Ms. Wilson-Jones listed several past relevant jobs: Janitor/Cleaner (DOT Code 381.687-018); Transporter/Wheelchair Assistant (DOT Code 355.677-014); Teacher's Aide (DOT Code 249.367-074); and Cashier (DOT code 211.462-010)(Tr. 147).

not be other jobs within the region that a person with those restrictions could do (assuming that those restrictions were deemed credible)(Tr. 332).

Subsequently, Plaintiff's counsel asked Ms. Wilson-Jones several questions about her response that Plaintiff could do her past work as a janitor.  In her responses, Ms. Wilson-Jones testified that the janitor cleaner position she listed in her report had a Specific Vocational Preparation ("SVP")[19] of 2.  Reasoning at that level was a 1 (Tr. 333).  The initial number of 47,000 janitor and cleaner jobs that Ms. Wilson-Jones referenced to earlier came from the Minnesota Workforce Center website (Tr. 337).  As for the 7,000 to 10,000 number for janitorial jobs with light exertional levels, Ms. Wilson-Jones stated that this number was formulated from her 25 years of experience in job analysis (Tr. 338-39).  Part of her analysis involved interviewing businesses in the janitorial field, including Marsden-Plaintiff's former employer (Tr. 339).  Ms. Wilson-Jones did not know the margin of error for her methodology (Tr. 340).  Based on those responses, Plaintiff's counsel objected to Ms. Wilson-Jones' statements regarding the number of available jobs (Tr. 341).  Plaintiff's counsel argued that there was no "connection between the conclusions that she[] [drew] and the data that she[] relied on"(Tr. 341).  In response to counsel's objection, Ms. Wilson-Jones reiterated that her testimony was consistent with the DOT with the exception that she also relied on her experience and education (Tr. 342).

---

[19] SVP, as defined in Appendix C of the DOT, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. See http://online.onetcenter.org/help/online/svp (last visited July 10, 2008).  The level of time at SVP 2 is anything beyond short demonstration up to and including one month. Id.

**The ALJ's Findings and Decision**

As previously stated, on March 10, 2006, the ALJ issued his decision denying Plaintiff's request for social security benefits (Tr. 15-24). The ALJ followed the sequential five-step procedure as set out in the rules. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a). The Eighth Circuit has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the RFC to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform the past relevant work then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ determined that Plaintiff met the requirements for the first two steps of the disability determination procedure. The ALJ found that Plaintiff had not engaged in substantial gainful activity (Tr. 17). At step two, the ALJ found that Plaintiff had several severe impairments that caused significant limitations in the claimant's ability to perform basic work activities: major depression, recurrent depression NOS, borderline intellectual functioning with a learning disability NOS, cannabis abuse, and alcohol dependence (Tr. 17). However, the ALJ also noted that "the medical evidence of record documents no severe medically determinable physical impairment" (Tr. 18).

At step three, the ALJ determined that Plaintiff's impairments did not meet or equal one

CASE 0:07-cv-01596-DWF-AJB   Document 20   Filed 07/31/08   Page 21 of 30

of the listed presumptively disabling impairments (Tr. 18). The ALJ indicated that Plaintiff's

medical record documented a history of "only sporadic mental health treatment, with repeated

non-compliance with follow-up appointments and medication" (Tr. 19). The ALJ also placed

little weight on the opinions of Ms. Hermanson and Dr. Wamuo regarding Plaintiff's work-

related limitations and their explanation of those opinions as they were not supported by

substantial evidence. The ALJ did, however, rely on their contemporaneous treatment notes and

recommendations diagnosing Plaintiff with moderate major depression (Tr. 21).

At step four, the ALJ determined that Plaintiff had the residual functioning capacity to

perform work requiring routine, repetitive work tasks, with no significant reading required, such

that the work would be given by simple written instruction or demonstration, with low to

moderate standards for production and pace, and brief superficial contact with others (Tr. 21).

The ALJ held that Plaintiff was unable to perform any past relevant work (Tr. 23).

However, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined

that Plaintiff was able to perform a significant number of jobs in the national economy (Tr. 23).

Accordingly, the ALJ found that Plaintiff was not disabled (Tr. 24).

**Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is

supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Murphy v.

Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

"The substantial evidence test employed in reviewing administrative findings is more than a

mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

**Discussion**

*Plaintiff's RFC*

Plaintiff argues that the ALJ erred by not accepting the opinions of Ms. Hermanson and

Dr. Wamuo with respect to Plaintiff's work-related limitations. See Pl.'s Mem. 9-11 [Docket No.

11].  Specifically, Plaintiff argues that the opinions of Ms. Hermanson and Dr. Wamuo

concerning Plaintiff's ability to sustain gainful employment were entitled to controlling weight.

Id. at 9.

Here, the ALJ place little weight on the opinions of Ms. Hermanson and Dr. Wamuo

stating:

> [T]he opinions of Ms. Hermanson and Dr. Wamuo regarding the claimant's work
> related limitations, or their explanation of those opinions, [do not appear] to be
> supported by substantial evidence, and has placed greater weight on their
> contemporaneous treatment notes and recommendations, which document only
> moderate major depression (Tr. 21).

For example, the ALJ notes that in a questionnaire completed at the request of Plaintiff's

attorney on November 22, 2005, Ms. Hermanson and Dr. Wamuo opined that Plaintiff would

have "poor to no" ability to maintain regular attendance and be punctual within customary,

usually strict tolerances, make simple work-related decisions, complete a normal work day and

week without interruptions from psychologically based symptoms, perform at a consistent pace

without an unreasonable number and length of rest periods, deal with normal work stress, set

realistic goals, or make plans independently of others (Tr. 20, 285-289).  They further opined

that Plaintiff would have work absences in excess of three days per month (Tr. 20, 287).

However, progress notes from these mental health professionals document only moderate major

depression from the time the claimant was first seen in March 2005, at which time she was not

taking medication (Tr. 20).  These notes documented minimal reports of depressive symptoms ,

and numerous reports of engaging in activities inconsistent with severe depressive symptoms or

functional limitations (Tr. 20).  Because of the inconsistencies between the treatment notes and

work-related limitation opinions of Ms. Hermanson and Dr. Wamuo, the ALJ did not give great

weight to their disability opinions (Tr. 21). See 20 C.F.R. §§ 404.1527(c), 416.927(c)(when a

medical opinion is inconsistent with other evidence or is internally inconsistent, the ALJ is to

weigh all the evidence to determine if the claimant is disabled).

The Court finds that the ALJ did provide good reasons,[20] supported by the record, to

discount the work-related limitations imposed by Dr. Wamuo and Ms. Hermanson.  Ms.

Hermanson's and Dr. Wamuo's opinions were inconsistent in that even though substantial

evidence in the record from both individuals indicates that Plaintiff's condition had marked

improvement over the time she treated Plaintiff (i.e., her willingness to attend weekly therapy,

higher energy and better sleep at times, episodes of crying reduced, went on vacation with her

family)(Tr. 257-60, 263, 264, 266-68, 271-72, 288) and that her depression was of moderate to

mild intensity (Tr. 264, 266, 273, 288), both opined that Plaintiff was not yet ready for

competitive employment (Tr. 267, 285-87, 290).  Those inconsistencies are further supported by

the treatment notes reporting that Plaintiff's condition had significantly improved when Plaintiff

took her anti-depression medication (Tr. 267-68, 288).  Ms. Hermanson and Dr. Wamuo attempt

to justify these inconsistencies because their progress notes focused "on the positive" to help

Plaintiff with her symptoms in a therapeutic, supportive environment (Tr. 290).  Nevertheless,

the Court agrees with the ALJ in that for purposes of providing a complete medical record of

mental health treatment, it would be expected to see evidence of severe symptoms or limitations

of functioning noted either by Plaintiff's reported subjective complaints or the personal treatment

---

[20] Whether the ALJ grants a treating physician's opinion substantial or little weight, the
regulations provide that the ALJ must "always give good reasons" for the particular weight given
to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2).

notes and diagnoses of the medical professional notwithstanding any positive, supportive treatment notes.  No such documentation is contained in the record.

It is true that medical sources can opine as to the hours a claimant can work, and that physicians regularly make such assessments. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  In fact, medical opinions on how much work a claimant can do are not only allowed, but encouraged. Id.  It is equally true that an opinion from a medical source regarding a claimant's ability to work is not necessarily determinative of disability (see 20 C.F.R. §§ 404.1527(e), 416.927(e); Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996)(statements of disability are "not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]").  Opinions on issues reserved to the Commissioner are not entitled to any special significance. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p. Therefore, the opinions by Dr. Wamuo and Ms. Hermanson stating that Plaintiff was unable to work should not be entitled to special significance or controlling weight.  The Court agrees with the Commissioner that the ALJ's rejection of Dr. Wamuo's and Ms. Hermanson's opinions of Plaintiff's work-related limitations was substantially justified by the record.  Thus, for all the foregoing reasons the Court finds that the ALJ did not err in crediting the work limitation opinions of Dr. Wamuo and Ms. Hermanson little weight.

Hypothetical Question Posed to Vocational Expert by ALJ

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).  However, "[t]his

does not mean that the hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects-assuming of course, that the ALJ's findings are supported by substantial evidence." Onstad v Shalala, 999 F.2d 1232, 1234-35 (8th Cir. 1993). The ALJ's hypothetical question to the vocational expert must include all the appropriate impairments, and testimony by a vocational expert constitutes substantial evidence only when based on a proper hypothetical question. Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004). "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994)(quoting Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990)).

Plaintiff argues that the ALJ posed an improper hypothetical question to the vocational expert because the hypothetical did not contain the work-related limitations of her treating sources. However, a hypothetical question need only contain those limitations that are supported by the record. See Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004). In light of the finding that the ALJ did not err in placing greater weight on the work-related opinions of Ms. Hermanson and Dr. Wamuo, the Court finds that the ALJ properly included in the hypothetical question the work-related limitations that he found credible. See, e.g. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004)("fact that the ALJ omitted from his hypothetical question those aspects of [claimant's] subjective complaints that the ALJ considered non-credible does not render the question faulty."). The vocational expert's opinion was likewise supported by substantial evidence.

### Dictionary of Occupation Titles ("DOT") Error

Finally, Plaintiff argues that the testimony of Ms. Jones-Wilson does not constitute substantial evidence because it is inconsistent with the DOT and that the ALJ failed to follow SSR 00-4p.[21] See Pl.'s Mem. 13.  More specifically, in response to a hypothetical question posed by the ALJ, containing limitations to routine repetitive tasks, the vocational expert opined that such an individual could perform work as a janitor/cleaner (Tr. 330).  Ms. Jones-Wilson also stated that the janitor/cleaner occupation was described by the DOT as requiring a "Reasoning: Level 1" (Tr. 333).[22]  However, Plaintiff notes that the DOT "clearly states that the occupation of janitor/cleaner is described as requiring a Reasoning Level of 2." See Pl.'s Mem. 13; see also DOT, at App. C.[23]  Moreover, the DOT also "clearly states that the occupation of janitor/cleaner is described as requiring a Reasoning Level of 2." See Pl.'s Mem. 13; see also DOT 381.687-018

---

[21] This ruling emphasizes that before relying on the evidence of the vocational expert to support a determination or decision, the ALJ must "identify and obtain a reasonable explanation for any conflicts between occupation evidence provided by [vocational experts]...and information in the [DOT]...and explain in the determination or decision how any conflict that has been identified was resolved." See http://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html (last visited July 10, 2008).

[22] "Reasoning Level 1" is described by the DOT as:

> Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT, at App. C.

[23] "Reasoning Level 2" is described by the DOT as:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

(Tr. 147).  Thus, Plaintiff contends that the ALJ committed a reversible abuse of discretion for failing to elicit a reasonable explanation from the vocational expert as to how an individual restricted to a "Reasoning: Level 1" could perform jobs restricted to a "Reasoning Level 2" as required by SSR 00-4p. Pl.'s Mem. 14.

Nonetheless, the Court agrees with Defendant that Plaintiff's argument is misguided. The classification code referenced in Ms. Wilson-Jones' written report (i.e., DOT 381.678-018) concerned Plaintiff's past jobs as a janitor (Tr. 147).  Ms. Wilson-Jones stated that this type of work was unskilled work with a medium exertion level that imparted no transferable skills (Tr. 147).  Upon proposing the first hypothetical to the vocational expert, the ALJ gave no exertional restrictions (Tr. 330).  The vocational expert responded by saying that a person with the restrictions described could perform past work as a janitor (although the vocational expert did clarify to the ALJ that there were janitorial jobs with medium and light exertional restrictions) (Tr. 330).  The ALJ then proposed a second hypothetical including the light exertional restrictions to which Ms. Wilson-Jones stated that her testimony as to past work would not change because in the janitorial category there were at least 7,000 to 10,000 jobs with light exertional levels (Tr. 331).[24]  The vocational expert distinguished these 7,000 to 10,000 <u>light</u> exertional janitor/cleaner jobs from Plaintiff's past <u>medium</u> exertional airport janitor/cleaner job (Tr. 335-36)(emphasis added).  These light exertional janitorial jobs were the type performed "in

_____

[24] While the hearing transcript does not clearly indicate whether Plaintiff could perform her past work as a janitor based on the testimony of the vocational expert, the Court finds that Ms. Wilson-Jones' response to the ALJ's second hypothetical and the ALJ's subsequent decision provide sufficient evidence for the proposition that the vocational expert intended to mean that while Plaintiff could not perform her past janitorial work with the medium exertional restrictions (at step four), there were other janitorial jobs with light exertional restrictions that Plaintiff could perform in the national economy (at step five) (Tr. 23, 330-31, 335-36).

an office building after everybody else [was] gone and you clean up the office" or "in a building

or a church or something on the light side" (Tr. 331, 335).  According to the DOT, office

building janitor/cleaner jobs fall under DOT Code 381.687-014, entitled "Cleaner, Commercial

or Institutional."[25]  Under said code, the individual "keeps premises of office building, apartment

house, or other commercial or institutional building in clean and orderly condition.  Cleans and

polishes lighting fixtures, marble surfaces, and trim, and performs duties described in

CLEANER (any industry) I Master Title." Id.  This job has a "Reasoning Level 1", which

coincides with Ms. Wilson-Jones' testimony that there were 7,000 to 10,000 office

building/church janitor/cleaner jobs with light exertion levels requiring a "Reasoning: Level 1".

Thus, Plaintiff's argument that the vocational expert's testimony was inconsistent with the DOT

is unsupported by the record.

### Conclusion and Recommendation

Substantial evidence in the record as a whole supports the ALJ's finding that Plaintiff's

allegations of disability through her treating and examining physicians regarding Plaintiff's

work-related limitations were not fully credible.  The ALJ afforded the proper amount of weight

to the work limitation opinions of Ms. Hermanson and Dr. Wamuo in determining Plaintiff's

RFC and formulating a proper hypothetical for the vocational expert.  The vocational expert's

testimony was also consistent with the DOT.  Accordingly, the Court **HEREBY ORDERS** that

Commissioner's motion for summary judgment [Docket No. 17] is **GRANTED** and the

Plaintiff's motion for summary judgment [Docket No. 10] is **DENIED.**

---

[25] This occupational title also has an alternative title of "janitor". See DOT 381.687-014.

Dated:   July 31, 2008

   s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge


**Notice**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Clerk of Court before **August 11, 2008**.